**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Andrew J. Obergfell*
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aobergfell@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN KRUMENACKER, individually and on behalf of all others similarly situated,<br><br>                         Plaintiff,<br><br>v.<br><br>ROBINHOOD FINANCIAL, LLC, a Delaware LLC, ROBINHOOD SECURITIES, LLC a Delaware LLC, ROBINHOOD MARKETS, INC., a Delaware Corporation, and CHARLES SCHWAB & CO., INC., a California Corporation,<br><br>                         Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jordan Krumenacker ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action brought against Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood"), and Charles Schwab & Co., Inc. ("Charles Schwab") (collectively, "Defendants") for prohibiting their customers from buying multiple publicly traded stock options, including but not limited to GameStop ("GME"), AMC Entertainment ("AMC"), Nokia ("NOK"), BlackBerry Limited ("BB"), Bed Bath & Beyond ("BBBY"), Express ("EXPR"), Koss Corporation ("KOSS"), and Naked Brand Group ("NAKD") (collectively, the "Stocks"), during an unprecedented rise in valuation for the aforementioned Stocks.

2.     Robinhood is a multi-billion-dollar online brokerage firm founded in 2013. Robinhood's popularity has soared among retail investors and currently has an estimated 13 million active users.  However, none of these users were able to purchase the publicly traded Stocks on Defendant's platform during the dates in question.

3.     Charles Schwab is a multi-billion-dollar brokerage firm founded in 1971.  Charles Schwab has an estimated 30 million accounts.  However, none of these users were able to purchase the publicly traded Stocks on Defendant's platform during the dates in question.

4.     Defendants actions not only deprived their customers from taking advantage of the rise of the Stocks valuation but also manipulated the free and open market, causing a substantial decrease in the Stocks valuation, all in violation of federal securities laws and state common law.

5.     Specifically, the story begins with a "short" position held by major hedge funds, most notably hedge fund Melvin Capital Management, on GameStop Corp. stock (ticker

"GME").[1]  A "short" position is where a market participant, anticipating a certain security will decrease in value, borrows shares of the security and sells the borrowed shares at market price, with the goal of repurchasing the shares back at a later date at a lesser value, thereby pocketing the difference.

6.     However, this was no ordinary short sale, because the short interest in GME was *well over 100% of the shares of the stock that existed in the market*.  As Forbes noted:  "Indeed, Short interest for GameStop is estimated at almost 140% of its float[2]. That's extremely high. Short interest for Bed Bath and Beyond and AMC is at close to 70%. These are big numbers, typically short interest of 20% would be considered high. These stocks have massive short interest."[3]  This means that as it relates to GME, there was a claim on more than 100% of the shares in short positions alone, let alone call options coming to fruition and daily purchases of shares.

7.     This overexposure of short sellers created a unique opportunity for other investors to effectuate a "short squeeze," wherein a competing group of investors could purchase large volumes of shares of the stock, causing the stock price to increase rapidly.  When the stock price surges upward, it causes the short investor higher and higher potential losses, and incentivizes the short seller to abandon the short position, buy back the stock, and "close" their short position. The rapid buying to effectuate the "short squeeze" also limits supply of the outstanding stock that the short investor can buy back to cover their short positions.

8.     This is exactly what happened, albeit from an unlikely source, to wit a large group of retail investors marshalled to action through Reddit forums and other social media platforms,

---

[1] https://www.businessinsider.com/melvin-capital-lost-53-percent-january-after-gamestop-shares-skyrocketed-2021-1 (last visited 1/31/21).
[2] The term "float" refers to all the shares in existence.
[3] https://www.forbes.com/sites/simonmoore/2021/01/25/after-sky-rocketing-gamestops-short-squeeze-saga-continues-but-its-less-unusual-than-you-might-think/?sh=5ec5d6e25083 (last visited 1/31/21).

many of whom use Robinhood and Charles Schwab to effectuate their purchases of GME and the rest of the Stocks.

9. The short squeeze was sensationally effective, causing the price of GME to soar more than 1,500% this year.[4] Correspondingly, hedge funds that were short on GameStop recorded losses to the tune of approximately $19 billion.[5] The other Stocks showed similar trends.

10. This chain of events placed tremendous pressure on Robinhood, which ultimately chose to unlawfully manipulate the market to the detriment of retail investors, including Plaintiff and Class members.

11. The short squeeze threatened the solvency of hedge funds heavily short GME, who otherwise would be in the market to buy back as many shares as possible of GME to cover their short positions (i.e. return the shares that they borrowed). Thus, the hedge funds would be required to cover their own losses. But if they default, the losses would have to be covered by the clearinghouses, which have default funds to ameliorate such risks.

12. Clearinghouses "stand between two parties in a trade to guarantee payment if either side reneges."[6] To protect against default risk, "clearinghouses require their members — banks and brokers — to be well-capitalized, to deposit collateral and to pay into a default fund."[7] If the broker (i.e. Robinhood) cannot collect from the losers on the short side, then it "must have sufficient capital to cover losses to the clearinghouse."[8] As such, Robinhood itself was at risk

---

[4] https://markets.businessinsider.com/news/stocks/short-sellers-sitting-on-19-billion-of-losses-on-gamestop-data-shows-2021-1-1030020684 (last visited 1/31/21).
[5] Id.
[6] https://www.marketwatch.com/discover?url=https%3A%2F%2Fwww.marketwatch.com%2Famp%2Fstory%2Fpeterffy-calls-robinhood-decision-to-allow-limited-buys-of-gamestop-troubling-im-not-comfortable-11611876619&link=sfmw_tw#https://www.marketwatch.com/amp/story/peterffy-calls-robinhood-decision-to-allow-limited-buys-of-gamestop-troubling-im-not-comfortable-11611876619?mod=dist_amp_social (last visited 1/31/21).
[7] Id.
[8] Id.

because it had to raise large amounts of money due to the volatility of the Stocks. Both CNBC

and Bloomberg News reported that Robinhood had tapped each of its credit lines.[9]

13. Robinhood itself admits this. In its "Under The Hood" blog, Robinhood

explained:

> Clearinghouses are SEC-registered organizations that act as the central depository for securities. They keep a record of the stocks owned through a brokerage. Clearing brokerages, like Robinhood Securities, are members of clearinghouses. These clearinghouses have membership rules, approved by the SEC, that govern the activity of their members. Clearinghouses establish financial requirements for members including deposit requirements designed to reduce risk to the clearinghouse.

> . . .

> The amount required by clearinghouses to cover the settlement period of some securities rose tremendously this week. How much? To put it in perspective, this week alone, our clearinghouse-mandated deposit requirements related to equities increased ten-fold. And that's what led us to put temporary buying restrictions in place on a small number of securities that the clearinghouses had raised their deposit requirements on.

> It was not because we wanted to stop people from buying these stocks. We did this because the required amount we had to deposit with the clearinghouse was so large—with individual volatile securities accounting for hundreds of millions of dollars in deposit requirements—that we had to take steps to limit buying in those volatile securities to ensure we could comfortably meet our requirements. [10]

14. Faced with these hazards, someone had to lose, the overly shorted hedge funds,

Robinhood, or the ordinary retail investor. Robinhood made the executive decision that the

ordinary retail investor should lose, and unlawfully manipulated the market to restrict buying of

---

[9] *Id.*; https://www.cnbc.com/2021/01/28/robinhood-will-allow-limited-buying-of-restricted-securities-friday-gamestop-jumps-after-hours.html (last visited 1/31/21); https://www.bloomberg.com/news/articles/2021-01-28/robinhood-is-said-to-draw-on-credit-lines-from-banks-amid-tumult (last visited 1/31/21).
[10] https://blog.robinhood.com/ (last visited 1/31/21).

the Stocks (allowing only selling), which benefitted Robinhood and its hedge fund partners, but gravely injured the retail investors who were relying on a free market to trade these Stocks.

15.     To save itself (and likely its hedge fund investors), Robinhood halted all buying of GME and the other Stocks on its platform on Thursday, January 27, 2021, and only allowed selling.  Thereafter, it heavily restricted how many shares a retail purchaser could buy.  This had the effect of substantially depreciating the value of the Stocks, causing harm to Plaintiff and the Class.  Indeed, when Robinhood restricted further buying, and only selling, of the Stocks, GME closed down 44% from the highs earlier in the week.[11]

16.     Defendants actions are textbook market manipulation securities fraud, for which Plaintiff and the Class have a private right of action pursuant to 17 CFR § 240.10b-5.

17.     Specifically, Defendants engaged in manipulative acts by interfering with and manipulating the market as it relates to these Stocks by limiting trading of the same by disallowing any buying of the Stocks and only allowing selling.  This had the effect of depressing the share price for the Stocks by creating something of a one-way ratchet by depressing purchases while incentivizing selling.

18.     Plaintiff and the Class suffered damage because the value of the Stocks plummeted as a result of Defendants' market manipulation.

19.     Plaintiff and Class members relied on the assumption that the market was free of manipulation because prior to Defendants halting purchasing of the Stocks and only allowing selling, the Stocks were traded in a market free of manipulation.

20.     Defendants acted with scienter because they made the decision to specifically interfere in the market for their own benefit and to the detriment of Plaintiff and Class members.

21.     Plaintiff brings this action on behalf of himself and the putative class against Defendants for: (1) Violation of Section 10(b) of the Securities Exchange Act of 1934 and

---

[11] https://www.cnbc.com/2021/01/28/robinhood-will-allow-limited-buying-of-restricted-securities-friday-gamestop-jumps-after-hours.html (last visited 1/31/21).

Rule 10b-5 for market manipulation; (2) violation of Florida's Securities and Investor Protection Act ("FSIPA"); and (3) *per se* violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA").

22.     Plaintiff seeks an order for relief including, but not limited to, the following: (1) requiring Defendants to pay damages and restitution to Plaintiff and the putative Class; (2) statutory damages; (3) attorneys' fees and costs; and (4) enjoining the Defendants from further legal violations of prohibiting buying options on publicly traded stocks.

## PARTIES

23.     Plaintiff Jordan Krumenacker is a Florida resident who lives in Port St. Lucie, Florida. Mr. Krumenacker opened an account with Robinhood. At the time that the Robinhood Defendants ceased allowing buying of the Stocks, Mr. Krumenacker was actively invested in GME and AMC. As to GME, his Robinhood application advised him that "[y]ou can close out your position in this stock, but you cannot purchase additional shares." As to AMC, his Robinhood application advised him that "[y]ou can close out your position in this option, but you can't buy additional contracts." As a result of the Robinhood Defendants' conduct, Plaintiff Krumenacker suffered significant losses on his investments.

24.     Defendant Robinhood Financial, LLC is a Delaware LLC with a principal place of business located at 85 Willow Road, City of Menlo Park, California. Defendant Robinhood Financial is a brokerage firm regulated by the Financial Industry Regulatory Authority, Inc. ("FINRA").

25.     Defendant Robinhood Securities, LLC is a Delaware LLC with a principal place of business located at 85 Willow Road, City of Menlo Park, California. Defendant Robinhood Securities is a brokerage firm regulated by FINRA.

26.     Defendant Robinhood Markets, Inc. is a Delaware Corporation with a principal place of business located at 85 Willow Road, City of Menlo Park, California. Defendant Robinhood Markets is the parent company of Robinhood Financial and Robinhood Securities.

27.     Defendant Charles Schwab & Co., Inc. is a California Corporation with a principal place of business located at 211 Main Street, San Francisco, California.  Defendant Charles Schwab is a brokerage firm regulated by FINRA.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from Defendants.

29.     This Court has personal jurisdiction over Defendants because they are headquartered in this District, and many of the acts and transactions giving rise to this action occurred in this District.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, and because Defendants reside in this District.

## FACTS COMMON TO ALL CLAIMS

### *Background*

31.     Robinhood offers self-directed securities brokerage services to customers by means of its website and smartphone applications.  Defendants are Commission-registered broker-dealers and members of FINRA.

32.     Robinhood Financial acts as an introducing broker and has a clearing arrangement with Robinhood Securities.  Beginning in November 2019, Robinhood began sending all customer orders for trade execution to Robinhood Securities.  When customers open accounts with Robinhood, they enter into a customer agreement with Robinhood Financial and Robinhood Securities.

33.     Pursuant to FINRA rule 5310, broker-dealers such as Defendants owe their customers a duty of "best execution."  Best execution requires that a broker-dealer endeavor to

execute customer orders on the most favorable terms reasonably available in the market under the circumstances.

34.    On or about January 11, 2021, stocks in GME, AMC, and NOK, among other, began to rise.

35.    However, on or around January 27, 2021, these Stocks were no longer available for purchase from retail investors on Defendants' platforms.  For example, on Robinhood, the Stocks featured an icon that read, "This stock is not supported on Robinhood":



36.    Defendants prohibited the purchase of the stocks by its retail investors purposefully, knowingly, and willingly.

37.    By prohibiting the purchase of the Stocks, Defendants denied its consumers the ability to purchase shares of stocks rapidly rising in valuation.

38.    Defendants' prohibition on purchasing the Stocks had a direct impact on lowering their valuation, resulting in losses for those consumers who already purchased the Stocks.

39.    Defendants prohibited further purchasing of the Stocks in direct violation of its duty of best execution.

**_Defendants Engaged In Market Manipulation_**

**A. The Securities And Exchange Act of 1934**

40. The Securities And Exchange Act of 1934 states:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   . . .

   **(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

   15 U.S.C. § 78j(b).

41. 17 C.F.R. § 240.10b-5 ("10b-5") states:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

42. One way that Rule 10b-5 can be violated is through market manipulation. *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009) ("Misrepresentations and most omissions fall under the prohibition of Rule 10b–5(b), whereas manipulative conduct typically constitutes 'a scheme ... to defraud' in violation of Rule 10b–5(a) or a 'course of business which operates ... as a fraud or deceit upon any person' in violation of Rule 10b–5(c).");

*Halbert v. Credit Suisse AG*, 402 F. Supp. 3d 1288, 1305 (N.D. Ala. 2019) ("Rule 10b-5 creates two types of claims under Section 10(b): misrepresentation/nondisclosure claims pursuant to Rule 10b-5(b), and scheme liability/market manipulation claims pursuant to Rule 10b-5(a) and (c).").

43.     "To plead a claim based on market manipulation, a plaintiff must allege, *inter alia,* that the defendant engaged in manipulative acts, that the plaintiff suffered damage, which was caused by his or her reliance on an assumption that the market was free of manipulation, and that the defendant acted with scienter." *In re Bank of Am. Corp.*, 2011 WL 740902, at *6 (N.D. Cal. Feb. 24, 2011).

44.     Here, Defendants engaged in market manipulation by intentionally restricting trading of the Stocks, specifically by only allowing selling of the Stocks combined with completely restricted and/or heavily restricted buying of the Stocks.

**1. Defendants Engaged In Manipulative Acts**

45.     Simply put, Defendants engaged in manipulative conduct by restricting market activity regarding the Stocks. The Robinhood Defendants completely restricted buying of the Stocks, and only allowed selling. Thereafter, the Robinhood Defendants continued to engage in market manipulation by heavily restricting buying, but still permitting selling of the Stocks. Indeed, in its January 28, 2021 blog post, Robinhood stated: "Amid this week's extraordinary circumstances in the market, we made a tough decision today to temporarily limit buying for certain securities," to wit the Stocks.[12] Robinhood further notes that "[s]tarting tomorrow [Friday, January 29, 2021], we plan to allow limited buys of these securities."[13]

46.     Defendant Charles Schwab engaged in similar restrictions both through its own platform and through TD Ameritrade, which it owns, engaged in similar market manipulative tactics to restrict the free market in the trading of the Stocks.[14]

---

[12] https://blog.robinhood.com/ (last visited 2/2/21).
[13] *Id.*
[14] https://www.marketwatch.com/story/gamestop-amc-trading-is-now-being-restricted-at-td-ameritrade-11611769804 (last visited 2/2/21).

47.    These tactics undertaken by Defendants were willful acts designed to deceive and/or defraud investors by controlling or artificially affecting the price of securities.

48.    Specifically, Defendants manipulative tactics caused severe losses in the value of the restricted securities, losses that would not have happened had Defendants not engaged in manipulation of the market.

49.    The Robinhood Defendants admitted that this market manipulation was done to protect themselves (and by extension their hedge fund business partners[15]) from losses at the expense of Plaintiff and Class members.

50.    Indeed, Robinhood advertises to consumers that its mission is to "democratize finance for all."[16] Robinhood further explains that "We believe that everyone should have access to the financial markets, so we've built Robinhood from the ground up to make investing friendly, approachable, and understandable for newcomers and experts alike."[17]

51.    But when its mission was put to the test, Robinhood folded and protected itself at the expense of its customers.

52.    Based on Robinhood's representations to Plaintiff and Class members, and Plaintiffs and Class members customary practice prior to the shutdown of freely trading securities such as the Stocks, Plaintiff and Class members were erroneously (as we now know) lead to believe that the prices for the Stocks were driven by the natural interplay of supply and demand, not rigged by manipulators. But Defendants, despite leading Plaintiff and Class members to believe they were operating in a free market, rigged and manipulated the market for the Stocks.

---

[15] https://www.cnbc.com/2019/04/18/a-controversial-part-of-robinhoods-business-tripled-in-sales-thanks-to-high-frequency-trading-firms.html (last visited 2/2/21); https://www.equities.com/news/robinhood-is-said-to-get-40-revenue-from-hft-firms-like-citadel (last visited 2/2/21).
[16] https://robinhood.com/us/en/support/articles/our-mission/ (last visited 2/2/21).
[17] *Id.*

53.     Plaintiff and Class members had no reason to believe that Defendants would so rig and manipulate the market for the Stocks until Defendants did so.

54.     In short, the Robinhood Defendants and Defendant Charles Schwab engaged in market manipulation by restricting and manipulating the free market for the Stocks in question, as discussed above.  The manipulative acts were performed beginning on or around January 27, 2021, and, upon information and belief, continue to the present day to a lesser degree. Defendants' manipulative conduct had a clear impact in the market for the securities at issue, each fell precipitously, causing investors losses.[18]

**2.  Defendants Acted With Scienter**

55.     Defendants made false and misleading statements either intentionally or with deliberate recklessness.

56.     As set forth above, the Robinhood Defendants represented to consumers that their platform was intended to democratize finance and provide access to the financial markets.  These statements ultimately proved to be false.

57.     Defendants' conduct also evidences a strong inference of scienter.

58.     Indeed, Robinhood has revealed that it acted intentionally to the detriment of investors.  Robinhood's CEO, Vlad Tenev, stated publicly in an interview with Elon Musk that "as a clearing broker, and this is where Robinhood Securities comes in, we have to put up money to the NSCC [National Securities Clearing Corporation]," and that the NSCC gave Robinhood a file requesting deposit of $3 billion dollars, later lowered to $1.4 billion through negotiations, and again reduced to $700 million, which Robinhood paid.  Elon Musk then asked Mr. Tenev "[i]s anyone holding you hostage right now?"  To which Mr. Tenev answered "no."  In discussing the decision to have position closing only, Mr. Tenev said "**we knew this was a bad outcome for customers**."[19]

---

[18] https://www.cnbc.com/2021/02/01/gamestop-slide-continues-after-hours-trading.html (last visited 2/2/21).
[19] https://www.realclearpolitics.com/video/2021/02/01/elon_musk_interviews_robinhood_ceo_vl ad_tenev_on_stock_tradigin_restrictions_on_clubhouse_app.html (last visited 2/2/21).

59.     Thus, this Court need not look beyond Robinhood's own admission regarding its state of mind to evaluate scienter.  Robinhood's own CEO stated that Robinhood elected to manipulate the market on the Stocks and acted knowing that its actions would cause a bad outcome for customers.

60.     While these statements alone raise a strong inference of scienter, a broader holistic view of the circumstances described herein create a strong inference of intentional conduct or deliberate recklessness.  This includes the heavily shorted hedge funds, some of whom were heavily involved with Robinhood, who stood to lose if trading remained open.  A holistic view establishes, at minimum, that Defendants manipulated the market to protect themselves at the expense of their customers.

61.     Any reasonable person would deem Plaintiff's allegations of scienter as cogent and at least as compelling as any opposing inferences.

**3.  Reliance**

62.     Plaintiff and Class members specifically relied on Defendants' representations and their course of dealing with Defendants.  Specifically, Plaintiff chose to use Robinhood based on the understanding that he would be able to freely trade securities, including the Stocks.  Plaintiff's belief was informed by Robinhood's representations that it sought to democratize finance and provide him open access to the markets.  Plaintiff used Charles Schwab based on the assumption that we would have access to the markets.  His course of dealing with both companies informed that analysis.

63.     Plaintiff and the Class are also entitled to a presumption of reliance based on the "fraud-on-the-market presumption."  "The fraud-on-the-market presumption is available when the securities at issue trade on an 'efficient' market." *In re Bank of Am. Corp.*, 2011 WL 740902, at *13.  Plaintiff and the Class justifiably relied on a free and open market for the Stocks.  There was no reason to believe Defendants would interfere with that market.

**4. Loss Causation**

64.     Plaintiff and Class members directly suffered as a result of Defendants' securities fraud.

65.     It is a matter of objective fact that the Stock price fell after Defendants placed these artificial restrictions on trading for the Stocks.  Before the restrictions, the Stocks were rising in value rapidly.  There can be no reasonable dispute that Defendants' conduct caused Plaintiff's and the Class' losses.

### *Defendants Violated Florida State Securities Laws and FDUPTA*

66.     It is well settled that "State securities laws operate in conjunction with the federal laws; federal laws do not supersede state laws." *Rousseff v. E.F. Hutton Co.*, 867 F.2d 1281, 1283 (11th Cir. 1989).

67.     The Florida Securities and Investor Protection Act contains provisions similar to Rule 10b-5, Fla. Stat. Ann. § 517.301 states, in pertinent part:

> (1) It is unlawful and a violation of the provisions of this chapter for a person:
>
> (a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:
>
> 1. To employ any device, scheme, or artifice to defraud;
>
> 2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>
> 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

68. "The elements of a cause of action under Section 301 are identical to those under Rule 10b–5 of the Exchange Act, 'except that the scienter requirement under Florida law is satisfied by [a] showing of mere negligence,' *Grippo v. Perazzo,* 357 F.3d 1218, 1223 (11th Cir.2004) (citing *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1046 (11th Cir.1987)), and a plaintiff does not need to prove loss causation under Florida law." *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011).

69. For the reasons stated above, Plaintiff satisfies each element of his claim under the FSIPA because the elements are similar to a 10b-5 claim but even less stringent, lowering the scienter requirement to mere negligence and not requiring proof of loss causation.

70. Because Defendants violated the FSIPA, they also *per se* violated Florida's consumer-protection statute, FDUPTA.

## **CLASS ALLEGATIONS**

71. Plaintiff brings this action on behalf of himself and as a representative of all similarly situated individuals pursuant to Fed. R. Civ. P. 23 and proposes the following Class definition: All persons within the United States who maintained a Robinhood and/or Charles Schwab account from January 1, 2021 through present (the "Nationwide Class"). Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors, as well as any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

72. Plaintiff also seeks to represent a subclass of all persons in the State of Florida who maintained a Robinhood and/or Charles Schwab account from January 1, 2021 through present (the "Florida Subclass") (the Nationwide Class and Florida Subclass are collectively referred to as the "Class").

73. Members of the Class are so numerous that their individual joinder herein is impracticable. Robinhood has millions of active users nationwide. By that metric alone, individual joinder of Class members is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery,

specifically through Defendants' records. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

74. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A. Whether federal securities laws were violated by Defendants' acts as alleged herein;

    B. Whether Defendants' conduct violated Florida's securities laws;

    C. Whether Defendants' conduct constitutes a *per se* violation of FDUPTA;

    D. Whether Defendants' acted with scienter and whether their conduct was negligent;

    E. Whether Defendants engaged in market manipulation in restricting trading of the Stocks on their platforms; and

    F. Whether Plaintiff and Class members suffered damages.

75. The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, held an account with Robinhood and Charles Schwab and was subject to the same conduct and omissions by Defendants. Plaintiff, like all other class members, was prohibited from purchasing the Stocks on or around January 27, 2021 onward. There are no defenses that Defendants may have that are unique to Plaintiff.

76. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting complex class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

77. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and

extensive litigation necessary to establish Defendants' liability.  Individualized litigation

increases the delay and expense to all parties and multiplies the burden on the judicial system

presented by the complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action

device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendants' liability.  Class treatment of the liability issues will ensure that all claims and

claimants are before this Court for consistent adjudication of the liability issues.

78.     Plaintiff brings all claims in this action individually and on behalf of members of

the Class against Defendants.

## COUNT I
### Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5
### (On Behalf Of Plaintiff And The Nationwide Class)

79.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

set forth herein.

80.     This Count is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C.

§ 78(j)(b), and Rule 10b-5 promulgated thereunder by the SEC.

81.     Defendants, as described at length above, engaged in illegal market manipulation

in violation of federal securities law.

82.     Defendants committed a manipulative act by restricting trading of the Stocks on

their platforms, as described above.  Robinhood permitted only selling of the Stocks followed by

limited buying, and by doing so manipulated the market and impacted the value of the Stocks.

83.     Defendants acted with scienter because they knew that their conduct would cause

harm to Plaintiff and Class members, and proceeded to manipulate the market regardless.

Perhaps the clearest evidence of Robinhood's scienter is that its CEO publicly admitted that he

and Robinhood knew that its actions would be harmful to its customers, and restricted selling of

the Stocks fully aware of this fact.  Even from a holistic view of the circumstances, it is clear

Defendants intentionally manipulated and interfered with the market in violation of the law, and to the detriment of Plaintiff and members of the Nationwide Class.

84.     Plaintiff specifically relied on Defendants' representations to his detriment.  As to Robinhood, Plaintiff relied on Robinhood's representations and promises that he would have free and open access to the markets, including the Stocks.  As to all Defendants, Plaintiff relied on his course of dealing with Defendants wherein he was able to freely trade securities, including the Stocks.

85.     Plaintiff and the Class are entitled to a presumption of reliance based on the fraud-on-the-market presumption.  Specifically, Plaintiff and Class members had the right to rely on a free and open market for the Stocks at issue (i.e. a market free of manipulation).

86.     Plaintiff and members of the Nationwide Class suffered damages as a direct and proximate result of Defendants' conduct, to wit a rapid and precipitous decline in the value of the Stocks directly caused by Defendants' conduct.

87.     Plaintiff and members of the Nationwide class are entitled to damages, statutory damages, and attorneys' fees and costs of suit.

## COUNT II
### Violation Of The Florida Securities And Investor Protection Act
### (On Behalf Of Plaintiff And The Florida Subclass)

88.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

89.     Defendants, as described at length above, engaged in illegal market manipulation in violation of FSIPA.

90.     Defendants committed a manipulative act by restricting trading of the Stocks on their platforms, as described above.  Robinhood permitted only selling of the Stocks followed by limited buying, and by doing so manipulated the market and impacted the value of the Stocks.

91.     Defendants acted with scienter because they knew that their conduct would cause harm to Plaintiff and Class members, and proceeded to manipulate the market regardless. Perhaps the clearest evidence of Robinhood's scienter is that its CEO publicly admitted that he

1  and Robinhood knew that its actions would be harmful to its customers, and restricted selling of

2  the Stocks fully aware of this fact.  Even from a holistic view of the circumstances, it is clear

3  Defendants intentionally manipulated and interfered with the market in violation of the law, and

4  to the detriment of Plaintiff and members of the Nationwide Class.

5      92.    At minimum, Defendants actions were negligent, which is all that is required to

6  state a claim under FSIPA.

7      93.    Plaintiff specifically relied on Defendants' representations to his detriment.  As to

8  Robinhood, Plaintiff relied on Robinhood's representations and promises that he would have free

9  and open access to the markets, including the Stocks.  As to all Defendants, Plaintiff relied on his

10  course of dealing with Defendants wherein he was able to freely trade securities, including the

11  Stocks.

12      94.    Plaintiff and the Class are entitled to a presumption of reliance based on the fraud-

13  on-the-market presumption.  Specifically, Plaintiff and Class members had the right to rely on a

14  free and open market for the Stocks at issue (i.e. a market free of manipulation).

15      95.    Plaintiff and members of the Nationwide Class suffered damages as a direct and

16  proximate result of Defendants' conduct, to wit a rapid and precipitous decline in the value of the

17  Stocks directly caused by Defendants' conduct.

18      96.    Plaintiff and members of the Nationwide class are entitled to damages, statutory

19  damages, and attorneys' fees and costs of suit.

20                          **COUNT III**
    **Violation of Florida's Deceptive and Unfair Trade Practices Act**
21               **(On Behalf Of Plaintiff And The Florida Subclass)**

22      97.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

23  set forth herein.

24      98.    FDUPTA protects "the consuming public and legitimate business enterprises from

25  those who engage in unfair methods of competition or unconscionable, deceptive or unfair acts

26  or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.212(2).

27

28

---

99.     Plaintiff and Florida Subclass members are "consumers" within the meaning of FDUPTA.  Fla. Stat. Ann. § 501.203(7) ("Consumer" means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination.").

100.     By soliciting investor funds as described in detail above, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

101.     Defendants have committed a *per se* violation of FDUPTA by virtue of their violation of The Florida Securities And Investor Protection Act, which is a statute designed for consumer protection and proscribes unfair methods of competition and deceptive acts and practices.

102.     Defendants caused injury to Plaintiff and Florida Subclass members because Defendants' actions, described above, caused the value of the Stocks to precipitously decline thereby harming the value of Plaintiff's and the Florida Subclass' investments.  Plaintiffs and Florida Subclass members suffered a substantial loss proximately caused by Defendants' conduct.

103.     Accordingly, Defendants are liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)     For an order certifying the Class under Rule 23 and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that the Defendants' conduct violates the statutes referenced herein;

1       (c)    For an order finding in favor of Plaintiff and the Class on all counts

2             asserted herein;

3       (d)    For compensatory, punitive, and statutory damages in amounts to be

4             determined by the Court and/or jury;

5       (e)    For prejudgment interest on all amounts awarded;

6       (f)    For injunctive relief as pleaded or as the Court may deem proper; and

7       (g)    For an order awarding Plaintiff and the Class their reasonable

8             attorneys' fees and expenses and costs of suit.

9 **<u>DEMAND FOR TRIAL BY JURY</u>**

10      Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

11 issues so triable.

12

13 Dated: February 2, 2021               Respectfully submitted,

14                              **BURSOR & FISHER, P.A.**

15                              By:    */s/ L. Timothy Fisher*

16                                     L. Timothy Fisher

17                            L. Timothy Fisher (State Bar No. 191626)

18                            1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596

19                            Telephone: (925) 300-4455
Facsimile: (925) 407-2700

20                            E-Mail: ltfisher@bursor.com

21                            **BURSOR & FISHER, P.A.**
Andrew J. Obergfell*

22                            888 Seventh Ave.
New York, NY 10019

23                            Telephone: (212) 837-7150
Facsimile: (212) 989-9163

24                            Email: aobergfell@bursor.com

25

26                            **BURSOR & FISHER, P.A.**
Stephen A. Beck*

27                            701 Brickell Avenue, Suite 1420
Miami, FL 33131

28

Telephone: (305) 330-5512
Facsmile:   (305) 679-9006
E-Mail: sbeck@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*